2010 ME 137

**STATE of Maine**

v.

**David McCURDY.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Dec. 1, 2010.

Decided: Dec. 23, 2010.

Jeffrey C. Toothaker, Esq., Toothaker & Chong, Ellsworth, ME, for David McCurdy.

Michael E. Povich, District Attorney, Catherine Cole Lindberg, Asst. Dist. Atty., Ellsworth, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.

[¶ 1] David McCurdy appeals from a judgment of the District Court (Machias, *Romei, J.*) finding him in violation of a scallop-fishing catch-measurement regulation published to implement 12 M.R.S.

§ 6728 (2009) governing scallop fishing in Cobscook Bay. McCurdy contends that the Department of Marine Resources 2009 regulation concerning the size measurement of scallop meat, as applied through the sampling method used in this case, is unconstitutionally vague, *see* Me. Dep't of Marine Resources, 13 188 C.M.R. § 011–11.19(1)(D) (2009),[1] because it did not specify whether the officer would take a "random" or "culled" sample of the harvested scallop meats. Because the regulation, as applied in this case, was not sufficiently clear to give those regulated fair notice of what was required for compliance and promoted a result inconsistent with the scallop conservation purposes of the statutory authority for the regulation, we vacate the judgment.

## I. CASE HISTORY

[¶ 2] In the 2009–2010 scalloping season, scallop fishing in Maine's territorial waters was regulated by the Department of Marine Resources pursuant to 13 188 C.M.R. § Oil (2009). Applicable to all scallop fishing, these regulations prohibited: (1) use of scallop drags with rings of less than four inches,[2] 13 188 C.M.R. § 011–11.07(3); and (2) possession of scallops with a shell size "less than 4 inches in the longest diameter," 13 188 C.M.R. § 011–11.10(1)(B). These regulations implemented 12 M.R.S. § 6721–A(1)(B) (2009), which provided for the same shell-size restriction. Harvested scallops with less than the minimum shell size "must be immediately liberated into the waters from

which they were taken." 12 M.R.S. § 6721–A(3)(2009).

[¶ 3] Special regulations apply to scallop harvesting in Cobscook Bay, pursuant to 12 M.R.S. § 6728. On any day, no boat fishing in Cobscook Bay may take or possess more than fifteen gallons of scallop meat, 12 M.R.S. § 6728(1); 13 188 C.M.R. § 011–11.19(1)(B).[3] Of central importance to this case, the Cobscook Bay regulation also states, "[N]o vessel or person may take, possess or transfer shucked scallops which measure more than 35 meats per 16 oz. certified measure from or within the Cobscook Bay Restricted Area...." 13 188 C.M.R. § 011–11.19(1)(D). The regulation does not articulate a method for how the meats are to be measured other than reference to the use of a certified sixteen-ounce measure. *See id.* Violation of the regulations governing scallop fishing in Cobscook Bay is a civil violation that subjects a first offender to a mandatory fine of $500. 12 M.R.S. § 6728(3)(A).

[¶ 4] The 2009–2010 scallop fishing season extended, for five days a week, from December 15, 2009, to March 24, 2010. On December 24, 2009, David McCurdy, along with three crewmen, fished for scallops in Cobscook Bay. Within three hours they harvested fifteen gallons of shucked scallops contained in three five-gallon pails. McCurdy and members of his crew testified that this was a very good haul of high quality scallops in a short period of time. Because the catch was occurring so quickly, and because it was a very cold day, some harvested, unshucked scallops were

1. The regulation has been amended for the 2010–2011 scallop fishing season to articulate the sampling method more specifically. "The [scallop] meat count shall be measured by picking the smallest scallop meats from the harvester's catch." Me. Dep't of Marine Resources, 13 188 C.M.R. § 11–11.19(1)(D) (2010).

2. Title 12 M.R.S. § 6726(2) (2009) specifies that the ring size limit references interior diameter of the ring.

3. One and one half bushels of scallops in the shell, called "shellstock," is deemed to be equal to one gallon of scallop meat. 13 188 C.M.R. § 011–11.19(1)(A) (2009).

taken to the boat's wheelhouse to prevent freezing, and shucking was not completed until the boat neared a scallop dealer's dock in Lubec.

[¶ 5] At the dock, a Department of Marine Resources (DMR) officer was on duty checking the scallop harvest of local fishermen. The DMR officer checked McCurdy's buckets after McCurdy docked and entered the scallop dealer's facility. The officer testified that he stuck his hand into a bucket, rolled the scallops around until he saw small "meats" (shucked scallops), put the small meats in the measure (a pint-sized can), leveled the can off, and counted the meats. The officer did this measure three times and measured forty, forty-one, and forty-three meats per pint. McCurdy and his crew members testified that the officer separately dumped each of the three buckets into an empty fish container and took out the smallest scallops from each to fill three pint cans. McCurdy was then permitted to sell his catch, except for the three pint cans of the smallest scallops.

[¶ 6] The officer issued McCurdy a summons, alleging that McCurdy had committed a civil violation pursuant to 12 M.R.S. § 6728(1), because he had possessed shucked scallops measuring more than the thirty-five meats per sixteen-ounce certified measure limit specified in the Department regulation. McCurdy denied violation of the regulation and requested a trial.

[¶ 7] A bench trial was held on April 22, 2010. At trial the DMR officer testified that the purpose of the special catch size limits in Cobscook Bay was "for conservation of the scallop industry." He also testified that the regulation had been in effect for approximately four years, and that his regular practice in enforcement was to go through the scallop buckets, pick out the smallest meats, put those in the

measuring can, level the can off, and then count the meats.

[¶ 8] Evidence at trial also indicated that it is not possible to tell the size of the scallop meat by looking at the size of the scallop shell and that the meat size is only determinable when the scallop is shucked. Fishing ceases when the harvested bushels of scallops in the shell are estimated to be near the fifteen gallons of shucked scallops limit. Shucking then continues as the boat proceeds towards the dock, with all scallops placed in common containers as they are shucked. There is no practice of separating smaller meats into different containers.

[¶ 9] At trial McCurdy contended that a sampling to determine compliance with the regulation should involve a random sample of the contents of each bucket, rather than selection of the smallest scallops for placement in the certified measuring can. He argued that the smaller meats that were separated from the remainder of his catch constituted less than two percent of his total catch. He further argued that because there was no minimum meat size limit and because it was impossible to predict meat size from the shell size of legal scallops before the scallops were shucked, it was impossible for fishermen to determine whether or not a particular catch would or would not be violative of the size regulation, considering DMR's method for measuring compliance. Accordingly, McCurdy argued that, as applied through the measurement method, the regulation was unconstitutionally vague and violative of due process of law.

[¶ 10] In discussion with counsel, following close of the evidence, the court expressed concerns with the application and effect of the DMR measurement method. Referencing a fisherman's dilemma when, after shucking, the fisherman notes that a meat is small and might later be

singled out for measurement, the court asked the State: "[W]hat do you do with that meat, do you throw it away?" The State responded: "I think they do throw it away.... I think that is what they do."

[¶ 11] Later in stating its decision on the record, the court observed that the way the law was construed and enforced

doesn't necessarily achieve the conservation result that was intended when the law was enacted, because it seems like a fisherman might be inclined now to throw away a lot of meats and keep fishing, and essentially over-fish the area just to be really, really sure that if all the small ones are segregated he's going to be, quote, unquote 'legal.'

[¶ 12] The court ultimately found that the offense was committed. In reaching this result, the court indicated that it wanted to be consistent with a decision by another judge, on similar facts, announced just ten days before the trial. In imposing sentence the court suspended all but $100 of the statutory $500 fine, stating that the fine was reduced "because of the way the measure was taken. I think it meets the letter of the law, but not the spirit."

[¶ 13] McCurdy then brought this appeal. McCurdy argues that because the regulation at issue does "not give scallopers any guidance on 'how' the 'measure' is to be made (e.g., random or a culled sample)" and does not articulate a "minimum size meat regulation," a "person of ordinary intelligence" will not know how the regulation is to be implemented. McCurdy further argues, "If the State wants [fishermen] to throw smaller scallops back after being shucked, put that requirement in writing or come up with a minimum meat size regulation;" barring that, he contends, the regulation is too vague.

[¶ 14] For the 2010–2011 scalloping season that runs from December 15, 2010, through March 27, 2011, the DMR has

done as McCurdy suggested, adding to the meat count measurement regulation a sentence that reads: "The meat count shall be measured by picking the smallest scallop meats from the harvester's catch." 13 188 C.M.R. § 011–11.19(1)(D) (2010). Thus, today's opinion does not address, directly or by implication, the methods for determining compliance with the meat size limits in the 2010–2011 scalloping season.

## II. LEGAL ANALYSIS

[¶ 15] We review de novo a challenge to the validity of a regulation implementing a statute as a matter of law. *See State v. Haskell*, 2001 ME 154, ¶ 3, 784 A.2d 4, 7. When, as here, a statute gives only general direction and a regulation to implement the statute is ambiguous, we will give deference to an agency's interpretation of a regulation it is charged with administering, and as long as the interpretation the agency adopts is a reasonable one, the actions the agency takes in accordance with that reasonable interpretation will be affirmed. *See S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶¶ 4–5, 868 A.2d 210, 213–14, *aff'd* 547 U.S. 370, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006). However, that deference has its limits.

[¶ 16] When terminology in a regulation is so vague that businesses or individuals regulated—here, scallop fishermen—must guess at its meaning and cannot determine, in advance, how to conduct themselves to comply with the rule, such a subjective and unpredictable exercise of authority is violative of due process principles and an improper delegation of legislative authority to the executive. *See Kosalka v. Town of Georgetown*, 2000 ME 106, ¶ 17, 752 A.2d 183, 187 (holding that a regulatory standard that is "an unmeasurable quality, totally lacking in cognizable, quantitative stan-

dards" renders that standard "an unconstitutional delegation of legislative authority and violative of the due process clause"); *see also City of Portland v. Jacobsky,* 496 A.2d 646, 649 (Me.1985) (holding a regulatory requirement improperly vague when it was stated "in terms so vague that people of common intelligence must guess at its meaning"); *Me. Real Estate Comm'n v. Kelby,* 360 A.2d 528, 531 (Me.1976) (holding that a statute is void for vagueness when it forces people "of general intelligence to guess at its meaning, leaving them without assurance that their behavior complies with legal requirements and forc[es] courts to be uncertain in their interpretation of the law").

[¶ 17] Persons engaged in activities subject to state or local regulation are entitled to know with reasonable clarity what they must do to engage in the regulated activities without violation of the law or to obtain the permits or approvals they seek. *See Waterville Hotel Corp. v. Bd. of Zoning Appeals,* 241 A.2d 50, 53 (Me. 1968); *see also Cope v. Inhabitants of the Town of Brunswick,* 464 A.2d 223, 227 (Me.1983); *Shapiro Bros. Shoe Co. v. Lewiston–Auburn Shoeworkers Protective Ass'n,* 320 A.2d 247, 253 (Me.1974).

[¶ 18] The 2009 regulation at issue here pertained exclusively to scallop fishing in Cobscook Bay. It was published to implement a statute, 12 M.R.S. § 6728(1), the purpose of which, as testified by the DMR officer, is "conservation of the scallop industry." Outside of the regulation at issue, conservation is promoted by: (1) the fifteen gallons of shucked scallops daily catch limit; (2) the four-inch minimum shell size limit; and (3) the short, three-month fishing season.

[¶ 19] The contested portion of the 2009 regulation states, "[N]o vessel or person may take, possess or transfer shucked scallops which measure more than 35 meats per 16 oz. certified measure from or within the Cobscook Bay Restricted Area...." 13 188 C.M.R. § 011–11.19(1)(D). The record indicates: (1) it is not possible to tell scallop meat size from shell size; (2) by industry practice, scallops are placed in common containers, not segregated by meat size, while they are shucked; and (3) the mix of larger and smaller meats can only be determined when shucking is completed, usually after a boat leaves the fishing grounds. With these practices, a fisherman could reasonably infer that the sample taken pursuant to the regulation would be a random sample from the common container, or containers, into which shucked scallops had been placed. Prior to the 2010 clarification of the regulation, a fisherman encountering a DMR inspection would not have had reason to anticipate that all of the catch would be examined and the smallest meats collected to determine compliance with the meat size limit.

[¶ 20] As the State conceded in discussion with the District Court, had this sampling practice been anticipated, fishermen would have had incentive to segregate and throw away the smallest meats during shucking.[4] And, as the District Court recognized in its comments, this sampling practice would frustrate the conservation purpose of the law by encouraging fishermen to discard smaller meats and over-fish Cobscook Bay until the fifteen gallon limit was reached with larger meats that would pose no risk of violation upon sampling.

[¶ 21] With this record, we conclude that the 2009 conservation regulation, as

---

4. Throwing back shucked scallops would not result in conservation, as the act of shucking kills the scallop. "Catch and release" is only possible with unshucked scallops.

applied through the sampling method used to determine compliance, forced fishermen to guess at how the regulation would be applied, failed to give them adequate notice as to what fishing practices would comply with the law, promoted practices harmful to the conservation purpose of the law, and, as the District Court observed here, forced the courts to be uncertain in their interpretation of the law. *See Kelby,* 360 A.2d at 531. As such, the 2009 regulation, as applied through this sampling method, violated basic due process principles and was improperly applied to find that McCurdy had committed a civil violation of 12 M.R.S. § 6728. This particular defect has been corrected in the 2010 regulation. We express no opinion on the policy implications of the current regulation, as such issues are for the Legislative and the Executive Branches to decide.

The entry is:

Judgment vacated.