MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2014 ME 56
Docket:        PUC-13-277
Argued:        January 14, 2014
Decided:       April 8, 2014

Panel:         SAUFLEY, C.J., and, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

## CENTRAL MAINE POWER COMPANY

v.

## PUBLIC UTILITIES COMMISSION

SAUFLEY, C.J.

[¶1]  Central Maine Power Company appeals from a decision of the Public Utilities Commission in which the Commission found that, from 2008 to 2010, CMP had applied nearly $2.6 million worth of customer deposits to debts owed on its own transmission-and-distribution services when that portion of the deposits should have been applied to debts owed for standard-offer service.  CMP's central arguments are that (A) the Commission misinterpreted the governing statutes and regulations, (B) the Commission lacked the authority to apply its new interpretation retroactively because CMP had not had fair notice of that interpretation, and (C) the decision constituted improper retroactive ratemaking. We affirm the Commission's decision.

## I. BACKGROUND

[¶2] In 1999 and 2000, the Legislature substantially changed the regulation of Maine's electricity industry. *See* P.L. 1999, chs. 398 (varying effective dates), 657 (effective Apr. 10, 2000); *Houlton Water Co. v. Pub. Utils. Comm'n*, 2014 ME 38, ¶¶ 3-6, --- A.3d ---. To effectuate the Maine Legislature's goal of encouraging competition and innovation in the generation of electrical power, the amended Electric Industry Restructuring Act separates the generation of electricity from its transmission and delivery (T&D).[1] *See* 35-A M.R.S. §§ 3202, 3203 (2013); *Houlton Water Co. v. Pub. Utils. Comm'n*, 2014 ME 38, ¶¶ 3-6, --- A.3d ---.

[¶3] Under the Act, unless a customer selects a particular "competitive electricity provider," the customer will receive standard-offer service. *See* 35-A M.R.S. §§ 3201(5), 3212(1) (2013); 9 C.M.R. 65 407 301-2 § 1(C) (2010). The Commission selects standard-offer service providers through a bidding process. *See* 35-A M.R.S. § 3212(2) (2013).

[¶4] The T&D utility may require a deposit from certain customers receiving standard-offer service. *See* 9 C.M.R. 65 407 815-5 to -7 § 7 (2012); 35-A M.R.S. § 705 (2013). The value of that deposit for a residential applicant or customer cannot exceed "the two highest consecutive billing periods incurred

---

[1] T&D utilities are public utilities. 35-A M.R.S. § 102(13), (20-B) (2013).

within the previous 12-month period at that location" or, if there is no previous usage history at the location, at a comparable property. 9 C.M.R. 65 407 815-6 § 7(E)(1). For a non-residential applicant or customer, the deposit cannot exceed "the amount reasonably anticipated to be due for service for the two highest billing periods expected within a 12 month period." *Id.* § 7(E)(2).

[¶5] Despite the separation of generation from T&D utilities, when generation is provided to consumers through standard-offer service, the T&D utility is responsible for billing and collections for both the standard-offer provider's services and its own transmission and distribution services. *See* 9 C.M.R. 65 407 301-7 §§ 4(A), (B), 5(B) (2010); 9 C.M.R. 65 407 815-7 to -10 § 8 (2012). To compensate the T&D utility for providing billing and collections service on the standard-offer provider's behalf, and to cover a share of the uncollectable accounts, a percentage of the standard-offer provider's income is allocated to the T&D utility as an "adder."[2] *See* 9 C.M.R. 65 407 301-7 § 4(D) (2010). The adder is calculated before the bidding process for standard-offer service begins based on information from prior years about what percentage of profits are lost to bad debt and debt services. *See id.*

---

[2] The term "adder" does not appear in the regulations or statutes but is used as a term of art in the industry.

4

[¶6] Customers receiving electricity through standard-offer service receive a single, consolidated bill containing charges for both the electricity supplied through standard-offer service and the transmission and distribution of that electricity. *See id.* § 5(B). When a customer making payments under this consolidated billing pays less than the total owed on a bill, regulations require that the partial payment be allocated in a particular way. *See* 9 C.M.R. 65 407 322-6 § 6(C)(1) (2002). Specifically, the partial payment must be allocated to the oldest charges first, with transmission and distribution charges paid first if the "transmission and distribution charges and standard offer charges are of the same age." *Id.* § 6(C)(1)(a).

[¶7] After the 1999 and 2000 changes in the Act, CMP continued to use its existing "bucket system" to classify customer debts. CMP placed each debt into one of four "vintage buckets" based on its age: (1) current, (2) thirty days past due, (3) sixty days past due, and (4) ninety or more days past due. CMP did not differentiate among the ages of debts within the fourth bucket. The Commission initially adopted a rule regarding the treatment of partial payments that expressly allowed the continuation of the system with a limited number of buckets. *See* 9 C.M.R. 65 407 322 § 6(C)(2) (effective Apr. 21, 1999), *available at Metering, Billing, Collections, and Enrollment Interactions Among Transmission and*

*Distribution Utilities and Competitive Electricity Providers (Chapter 322)*, No. 1998-810, Corrected Rule, Chapter 322 (Me. P.U.C. May 17, 1999).[3]

[¶8]  The Commission changed the rule, however, within months—and well before the time period in dispute here—to eliminate the language approving the use of a limited number of buckets; the new rule required, without explicit exception, that partial payments be allocated to T&D receivables first, then standard-offer receivables, with the oldest charge to be paid first.  *See* 9 C.M.R. 65 407 322-6 § 6(C) (2002); *Amendments to Chapter 322*, No. 1999-659, Order Adopting Rule & Statement of Factual & Policy Basis (Me. P.U.C. Dec. 17, 1999). In its order adopting the new rule, the Commission did not emphasize that any change in the bucket system had been adopted, but it did state, "payments are allocated to oldest past due amounts first, and past due amounts of the same vintage are allocated first to the utility service." *Amendments to Chapter 322*, No. 1999-659, Order Adopting Rule & Statement of Factual & Policy Basis, at 5 (Me. P.U.C. Dec. 17, 1999).  The Commission further observed that the change "affects

---

[3]  Specifically, the rule provided in pertinent part that,

> if a transmission and distribution utility would have to modify its system for tracking past due amounts to identify by month past due amounts older than 90 or 120 days, it may instead group past due amounts older than 90 days in the same manner as it grouped such past due amounts prior to the effective date of this rule.

9 C.M.R. 65 407 322 § 6(C)(2) (effective Apr. 21, 1999), *available at Metering, Billing, Collections, and Enrollment Interactions Among Transmission and Distribution Utilities and Competitive Electricity Providers (Chapter 322)*, No. 1998-810, Corrected Rule, Chapter 322 (Me. P.U.C. May 17, 1999).

6

only the accounting of arrearages and write-offs," such that it "could impact the amount of the pre-determined uncollectible percentage that would be factored into future standard offer rates." *Id.* at 6.

[¶9]  As a result of CMP's continued use of a four-bucket system despite the December 1999 rule change, both partial payments on open accounts and deposits on disconnected accounts were allocated disproportionately to T&D debts because the method failed to make distinctions among the ages of debts within the bucket for the oldest debts.  Thus, newer T&D debts in the ninety-or-more-days-past-due bucket were prioritized over older standard-offer debts in that bucket.  Additionally, the information used to calculate the adder for standard-offer service providers skewed high because of the higher balance in the standard-offer receivables account.

[¶10]  Noting the precipitous increase of the adder, the Commission commenced an investigation in 2008 into partial-payment allocations between standard-offer and T&D services on open accounts.  As a result of that investigation, the Commission concluded that the use of the limited number of vintage buckets for allocation of partial payments on open accounts was contrary to the plain language of chapter 322, section 6 of its regulations.  *See Investigation into Partial Payment Allocation Between Standard Offer and Utility Service*, No. 2008-351, Order, at 1-2, 5 (Me. P.U.C. May 20, 2009).  In part because the

Commission did not, when it modified section 6 in December 1999, explicitly articulate a requirement that T&D utilities eliminate the use of limited buckets when applying partial payments to the standard-offer and T&D receivables accounts, the Commission ordered only prospective changes requiring the use of unlimited buckets for partial payments on open accounts beginning on July 1, 2009. *Id.* at 5-6. The Commission did not at that time investigate CMP's treatment of deposits on closed, past-due accounts for standard-offer customers. *See id.* at 1-4.

[¶11]  After CMP again sought an increase in the adder in 2010, the Commission began another investigation of CMP in October 2010 to examine its credit, collections, and accounting practices broadly and to determine whether its methodology for applying deposits on closed, past-due customer accounts was prudent and consistent with statutory and regulatory requirements. Over the course of about a year and a half, the Commission, CMP, and the Office of the Public Advocate exchanged and responded to data requests. During the proceedings, the Commission entered orders to protect confidential information from disclosure, the Commission staff issued bench analyses, CMP pre-filed testimony and exhibits, and several technical conferences were held.

[¶12]  Ultimately, a hearing was held on June 7 and 8, 2012. After the subsequent exchange of data requests and responses, and briefing, the hearing examiner filed a report in August 2012. CMP filed exceptions to the report.

[¶13]  The Commission entered its lengthy decision on January 25, 2013.  In its decision, the Commission first determined that an adjustment of the accounts receivable would not constitute retroactive ratemaking but would instead be the result of an interpretation of the Commission's rules affecting the adder, which is prospectively determined independent of the ratemaking process.

[¶14]  The Commission found that CMP was not "imprudent" simply by virtue of using the same four-bucket system for allocating deposits on closed, past-due accounts that it had previously also used for partial payments on open accounts.  *See Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 153 Me. 228, 243, 136 A.2d 726 (1957) ("In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for [the business managers'] as to the measure of a prudent outlay." (quotation marks omitted)); *Re Seabrook Involvements by Maine Utilities*, 67 P.U.R.4th 161, 166 (Me. 1985) (defining prudence as "follow[ing] a course of conduct that a capably managed utility would have followed in light of existing and reasonably knowable circumstances").  It did, however, hold CMP responsible for correcting the resulting misapplication of $2,592,658 in deposits to the T&D receivables account instead of the standard-offer receivables account from 2008 to 2010.

[¶15]  The Commission did not consider its corrective order to be inconsistent with its earlier decision to order only a prospective conversion to a

system with an unlimited number of buckets for partial payments effective July 1, 2009. At the time of that earlier decision, the Commission was aware only of CMP's method for allocating partial payments on open accounts; it did not at that time have information about how CMP was applying deposits on overdue terminated accounts. In addition, in reaching the decision now on appeal, the Commission interpreted its rules regarding the treatment of deposits,[4] but those rules were not relevant in the earlier proceeding where the Commission reviewed CMP's allocation of partial payments made on open accounts.[5]

[¶16] CMP moved for reconsideration or clarification, and the Commission denied that motion in an order entered on May 14, 2013. At no time did CMP specifically argue that "a deposit" cannot include more than the one component covering T&D services. CMP has appealed to us. *See* 35-A M.R.S. § 1320(1) (2013); M.R. App. P. 2(b)(3), 22.

---

[4] The Commission argues on appeal that its earlier decision regarding partial payments did not preclude the decision on deposits because the rules treat deposits and partial payments differently.

[5] The Commission separately found that CMP had been imprudent in managing its credit and collections functions because CMP had allowed customer account balances to accrue excessively without taking proper action to collect on debts, resulting in an increase in receivables. *See* 9 C.M.R. 65 407 301-7 § 4(A) (2010) (requiring the T&D utility providing residential service to "undertake all necessary actions under the provisions of Chapter 815 on behalf of standard offer providers" for purposes of credit and collection, disconnection, and handling of deposits); *see also id.* § 4(B) (imposing similar obligation for nonresidential service). The Commission determined that the imprudence resulted in an approximately $1.5 million loss to the standard-offer receivables account, taking into consideration the separate correction ordered to remedy the use of the four-bucket system, to prevent double-counting. The Commission therefore additionally ordered the transfer of $1.5 million from the T&D account to the standard-offer receivables account. One Commissioner dissented in part from the Commission's decision. He would have required, consistent with the examiner's report, that CMP reallocate $3.7 million to correct for CMP's imprudence in allowing debts to accrue excessively. CMP does not challenge this part of the Commission's determination on appeal.

## II.  DISCUSSION

A.    Interpretation of Rules

[¶17]  CMP argues that the Commission erred in interpreting the statues and regulations governing deposits to require T&D utilities to collect two separate deposits—one for T&D service and one for standard-offer service.    The Commission argues that, because CMP never argued to the Commission that the use of the term "a deposit" precluded an interpretation requiring a deposit with two components, that issue has been waived and cannot be raised on appeal.

[¶18]    "Generally, decisions of the Commission are reviewed only to determin[e] whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record."  *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 15, 818 A.2d 1039 (alteration in original) (quotation marks omitted).  "When reviewing an agency's interpretation of a statute that is both administered by the agency and within the agency's expertise, we apply a two-part inquiry."  *Id.*  We will first determine de novo whether the statute is "reasonably susceptible of different interpretations" and therefore ambiguous.  *Id.* (quotation marks omitted).  Next, we "either review the Commission's construction of the ambiguous statute for reasonableness or plainly construe the unambiguous statute."  *Id.*  "An agency's interpretation of an ambiguous statute it administers is reviewed

with great deference and will be upheld unless the statute plainly compels a contrary result." *Id.* (quotation marks omitted).

[¶19] These same standards apply when we review an agency's interpretation of its technical regulations, with the added requirement that the interpretation must comport with relevant statutes. *See Bertl v. Pub. Utils. Comm'n*, 2005 ME 115, ¶ 7, 885 A.2d 776. On appeal, the party challenging the decision has the burden of showing that the agency's action was "arbitrary or based on an error of law." *Fryeburg Health Care Ctr. v. Dep't of Human Servs.*, 1999 ME 122, ¶ 7, 734 A.2d 1141.

[¶20] Especially in this context, where the decision on appeal is that of an administrative agency, it is important for a party to raise an issue of statutory interpretation during the proceedings before that agency to give it an opportunity to consider the argument first. *See New Eng. Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife*, 550 A.2d 56, 59-60 (Me. 1988). The preservation of an issue is important to preserve fairness to both administrators and litigants, and it "ensures that the agency and not the courts has the first opportunity to pass upon the claims of the litigants." *Id.* at 60. "An issue is raised and preserved if there was a sufficient basis in the record to alert the [Commission] and any opposing party to the existence of that issue." *Verizon New Eng., Inc. v. Pub. Utils. Comm'n*, 2005 ME 16, ¶ 15, 866 A.2d 844 (quotation marks omitted).

[¶21]  Here, as the Commission correctly acknowledges, CMP argued to the Commission for its own interpretation of statutes and regulations that it contended were ambiguous.  CMP did not, however, specifically argue that the use of the singular "a deposit" prevented viewing a deposit as separable into two receivables accounts.  Nonetheless, because this conceptualization of the argument was generated primarily by the Commission's ultimate determination in its order that "CMP has essentially collected two deposits; one for T&D service and one for standard offer services," CMP's first opportunity to address the "dual-deposit" concept arose after the Commission's decision.  At that stage, CMP filed a motion for reconsideration based on an argument that neither the statutes nor the regulations required CMP to separate the deposits into two receivables accounts, which the Commission denied.  We therefore address the question of whether references to "a deposit" in 35-A M.R.S. § 705 and 9 C.M.R. 65 407 815-5 to -7 § 7 (2012) prevent a determination that the deposit must be segmented and allocated proportionately to standard-offer and T&D receivables accounts based on debt age.

[¶22]  By Commission rule, a "utility may demand *a deposit*" from residential and non-residential applicants and customers in defined circumstances. 9 C.M.R. 65 407 815-5 to -6 § 7(A)-(D) (emphasis added).  The rule provides that the deposit may not exceed (1) the amount of the two highest consecutive bills

during the prior twelve months at the location or a comparable location for residential customers or (2) the amount reasonably anticipated to be due during the two highest billing periods expected in a twelve-month period for nonresidential customers. *See id.* § 7(E).

[¶23]  The amount billed by a T&D utility includes charges for standard-offer service when the customer has not selected a competitive electricity provider. *See* 9 C.M.R. 65 407 301-7 § 5(B).  The T&D utility is responsible for undertaking the same chapter 815 collection activities regarding billed standard-offer service as it does for its own T&D service, *see id.* § 4, and chapter 815 authorizes the collection of deposits based on bills that include charges for both standard-offer service and T&D service, *see* 9 C.M.R. 65 407 815-6 § 7(E).

[¶24]  Chapter 815 provides that if a customer is disconnected, the utility "must apply the deposit, including accrued interest, to the account balance for *utility service* and refund the remainder within 30 days or with the final bill, whichever is later." *Id.* § 7(I)(1)(b) (emphasis added).  Standing alone, section 7(I)(1)(b) might suggest that all of the deposit should be allocated to the T&D utility's receivables account because standard-offer service is not "utility service." *See* 35-A M.R.S. § 102(13), (20-B) (2013) (defining "public utility" to include a T&D utility but not a standard-offer service provider).  Because the deposit is calculated based in part on standard-offer charges, and the T&D utility is

14

responsible for collections on standard-offer service, however, the rules could reasonably be interpreted differently. *See* 9 C.M.R. 65 407 301-7 §§ 4(A), (B), 5(B); 9 C.M.R. 65 407 815-6 § 7(E). The Commission's rules are "reasonably susceptible of different interpretations," and are, therefore, ambiguous. *See Competitive Energy Servs. LLC*, 2003 ME 12, ¶ 15, 818 A.2d 1039 (quotation marks omitted).

[¶25] Reviewing the Commission's interpretation of its own rules with great deference, as we must, *see id.*; *Bertl*, 2005 ME 115, ¶ 7, 885 A.2d 776, we cannot conclude that the Commission's interpretation was arbitrary or based on an error of law, *see Fryeburg Health Care Ctr.*, 1999 ME 122, ¶ 7, 734 A.2d 1141. Examining together all of the rules governing the handling of deposits, the Commission reasonably interpreted them to treat the deposits, which were calculated based on charges for both standard-offer and T&D services, as containing two components—one part for T&D service and the other part for standard-offer service—which must be allocated to the oldest debt first, with priority to T&D if the debts are of the same age. We do not discern any legal error or arbitrariness in the Commission's construction of its rules to require that, when a T&D utility engages in consolidated billing, it acts on its own behalf *and* on behalf of the standard-offer service provider.

B.    Retroactivity

[¶26]  CMP next contends that the Commission may not retroactively apply its latest interpretation of the deposit statutes and regulations to CMP because CMP lacked fair notice of the regulatory change and the Commission may not engage in rulemaking through adjudication.

[¶27]  The Maine Administrative Procedure Act defines a "rule" as a "regulation, standard, code, statement of policy, or other agency guideline or statement of general applicability . . . that is or is intended to be judicially enforceable and implements, interprets or makes specific the law administered by the agency, or describes the procedures or practices of the agency."  5 M.R.S. § 8002(9)(A) (2013).  Rulemaking requires compliance with the notice, comment, public hearing, and publication provisions set forth in 5 M.R.S. §§ 8052 to 8057-A (2013).

[¶28]  Specifically excepted from the definition of "rules," however, are "[d]ecisions issued in adjudicatory proceedings."  5 M.R.S. § 8002(9)(B)(3) (2013); *see Cobb v. Bd. of Counseling Professionals Licensure*, 2006 ME 48, ¶ 23, 896 A.2d 271.  The adjudicating agency "is not required to use the formal rule making procedures every time it makes a decision interpreting an existing rule." *Fryeburg Health Care Ctr.*, 1999 ME 122, ¶ 9, 734 A.2d 1141.  Case-by-case

determinations by an agency do not amount to rulemaking. *S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 30, 868 A.2d 210.

[¶29]   However, "[p]ersons engaged in activities subject to state or local regulation are entitled to know with reasonable clarity what they must do to engage in the regulated activities without violation of the law or to obtain the permits or approvals they seek." *State v. McCurdy*, 2010 ME 137, ¶ 17, 10 A.3d 686; *see also Tenants Harbor Gen. Store, LLC v. Dep't of Envtl. Prot.*, 2011 ME 6, ¶¶ 10-17, 10 A.3d 722 (vacating an agency's decision when it applied rules or criteria that were not adopted and set forth in statutes or agency rules).  We do not defer to agency interpretation when an agency takes enforcement action in a manner that deprives regulated parties of adequate notice about how to comply with the law and promotes practices that are contrary to the purpose of the law. *See McCurdy*, 2010 ME 137, ¶ 21, 10 A.3d 686; *see also Tenants Harbor Gen. Store,* 2011 ME 6, ¶ 16, 10 A.3d 722 (declining to defer to an agency when the statutory language compelled a contrary result).

[¶30]   CMP asks us to import a notice requirement—similar to the notice required before a rule change takes effect—into certain adjudicatory proceedings before an interpretation of a rule can be applied to past conduct.  Specifically, CMP urges us to adopt the fair notice doctrine, which has been applied primarily in federal circuit courts.  *See* Albert C. Lin, *Refining Fair Notice Doctrine: What*

*Notice Is Required of Civil Regulations?*, 55 Baylor L. Rev. 991, 996-97 & n.23 (2003). This doctrine, based largely on due process principles, *id.* at 998-1000, "protects a regulated party from civil penalties or similar sanctions where it did not have fair notice of an agency's interpretation of a regulation," *id.* at 992. "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Gen. Elec. Co. v. United States E.P.A.*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995).

[¶31] Without adopting the fair notice doctrine, we have applied similar concepts of due process in Maine. As we held in *State v. McCurdy*, 2010 ME 137, 10 A.3d 686, those engaged in regulated activities must be informed with reasonable clarity of what they must do to avoid violating the law. *Id.* ¶ 17. Unlike McCurdy, however, CMP has not been assessed with a civil penalty. *See id.* ¶¶ 3, 6, 12. The Commission has only ordered CMP to correct an accounting error.

[¶32] CMP argues that this accounting adjustment is no different than the separate sanction imposed by the Commission requiring a $1.5 million adjustment because CMP allowed debts to accrue excessively. We disagree. The reallocation that is now on appeal required an accounting adjustment between the standard-offer and T&D receivables accounts to ensure the proper determination of the adder in the future. Nowhere did the Commission require that CMP pay a fine

18

as a penalty to the State or impose any similar sanction. *Cf. Qwest Corp. v. Minn. Pub. Utils. Comm'n*, 427 F.3d 1061, 1063-64, 1068-69 (8th Cir. 2005) (applying the fair notice doctrine and affirming the imposition of a penalty of $25.95 million by the Minnesota Public Utilities Commission).

[¶33]  Although CMP argues that the fair notice doctrine should be applied whenever a large monetary loss is involved, the authority that CMP cites for this proposition does not support its argument. *See United States v. Chrysler Corp.*, 158 F.3d 1350 (D.C. Cir. 1998).  In the *Chrysler* case, the court applied the fair notice doctrine when the District Court ordered an automobile recall despite a statutory scheme that called for a degree of leniency in enforcement based on whether a reasonable person exercising reasonable care would be aware of an automobile's noncompliance when certifying that it complied with regulatory standards. *Id.* at 1354-55.  No such statutory provisions are in place here, and we conclude that the prospective financial impact on CMP does not alone render the accounting adjustment penal for purposes of applying the fair notice doctrine. *Cf. Arkansas Dep't of Human Servs. v. Sebelius*, 818 F. Supp. 2d 107, 120-22 (D.D.C. 2011) (holding that not all economic impacts are "sufficiently grave" to merit the application of the fair notice doctrine).

[¶34]  We recognize that the ordered correction will result in a significant increase in the amount of bad debt that CMP will carry.  The dollar amount

involved does not, however, convert an accounting adjustment, designed to ensure the proper calculation of the adder in the future, into a penalty.[6]

[¶35] Nor does the Commission's order requiring the adjustment of balances in the receivables accounts for the years 2008 to 2010 otherwise offend concepts of due process or reasonable notice in the circumstances of this case. CMP had access to the following information, which raised questions about its interpretation of the regulations to allow the separation of debts into a limited number of buckets: (1) in December 1999, the Commission published a rule amendment that eliminated language authorizing the use of a system with a limited number of buckets in allocating partial payments, *see Amendments to Chapter 322*, No. 1999-659, Order Adopting Rule & Statement of Factual & Policy Basis (Me. P.U.C. Dec. 17, 1999); (2) in 2008, the Commission ruled that, for partial payments on open accounts, it was unacceptable to use a system with a limited number of buckets effective July 1, 2009, *see Investigation into Partial Payment Allocation Between Standard Offer and Utility Service*, No. 2008-351, Order, at 5 (Me. P.U.C. May 20, 2009); and (3) CMP could readily observe that its

---

[6] Furthermore, in contrast to *McCurdy*, the commission's enforcement action does not "promote[] practices harmful to the . . . purpose of the law." *State v. McCurdy*, 2010 ME 137, ¶ 21, 10 A.3d 686. On the contrary, the regulated party's interpretation would undermine the fair application of the statutory and regulatory scheme, which is designed to make the T&D entity responsible for billing and collections for standard-offer service just as it is responsible for billing and collections for its own utility service.

allocations were substantially increasing the amount of standard-offer receivables as compared with the T&D receivables.

[¶36] Notwithstanding these indications, CMP interpreted the ambiguous rules in the light most favorable to its own financial prospects without seeking an advisory ruling. *See* 5 M.R.S. § 9001 (2013). We will not disturb the Commission's decision to require CMP to remedy its misallocation of deposits between the separate receivables accounts in these circumstances.

C. Ratemaking

[¶37] Finally, CMP argues that the change in application of the statutes and agency rules constitutes impermissible retroactive ratemaking.

[¶38] In regulating electricity utilities, "the Maine system of utility rate regulation is so designed that the Commission's authority to protect ratepayers from unjust or unreasonable rates is prospective and preventive in nature." *First Hartford Corp. v. Cent. Me. Power Co.*, 425 A.2d 174, 177 (Me. 1981). "Once rates have been set, the Commission may not adjust those rates retrospectively to make up for subsequently discovered mistakes in those rates." *Pub. Advocate v. Pub. Utils. Comm'n*, 1998 ME 218, ¶ 8, 718 A.2d 201. The Commission lacks the authority to grant retrospective rate relief to customers. *Id.* ¶ 15.

[¶39] Here, the rates already paid by ratepayers are in no way affected by the Commission's adjudication. CMP has not been directed to reimburse

ratepayers; rather it has been asked to remedy its misapplication of certain deposit sums to the T&D receivables account when they should have been applied to the standard-offer receivables account. Although the Commission's decision will affect future ratemaking through the next calculation of the adder, it does not retroactively affect rates. CMP may have relied on its anticipated use of the four-bucket allocation method during prior ratemaking proceedings, but the correction of its misunderstanding in this regard cannot transform the current decision into ratemaking; the rates were set and paid, and they have not been remade. Accordingly, the decision does not run afoul of the prohibition against retroactive ratemaking, and we affirm the decision of the Public Utilities Commission.

The entry is:

> Decision of the Public Utilities Commission affirmed.

---

**On the briefs:**

Catherine R. Connors, Esq., Jared S. des Rosiers, Esq., and Nolan L. Reichl, Esq., Pierce Atwood LLP, Portland, for appellant Central Maine Power Company

Charles Cohen, Esq., and Amy Mills, Esq., Public Utilities Commission, Augusta, for appellee Public Utilities Commission

22

**At oral argument:**

Catherine R. Connors, Esq., for appellant Central Maine Power Company

Charles Cohen, Esq., for appellee Public Utilities Commission

Public Utilities Commission docket number 2010-00327
FOR CLERK REFERENCE ONLY