MAINE SUPREME JUDICIAL COURT                                  Reporter of Decisions
Decision:      2023 ME 77
Docket:        PUC-23-65
Argued:        September 14, 2023
Decided:       December 28, 2023

Panel:         STANFILL, C.J., and MEAD, JABAR, CONNORS, LAWRENCE, and DOUGLAS, JJ.

OFFICE OF THE PUBLIC ADVOCATE

v.

PUBLIC UTILITIES COMMISSION et al.


JABAR, J.

[¶1]  The Office of the Public Advocate appeals from an order of the Public Utilities Commission approving an amended special rate contract between Bangor Natural Gas Company (Bangor Gas) and Bucksport Generation LLC.  *See* 35-A M.R.S. § 1320 (2023); M.R. App. P. 22.  The Public Advocate argues that the Commission reviewed the proposed contract under the wrong standard, and that its decision resulted in "unjust or unreasonable" rates, in violation of 35-A M.R.S. § 301(3) (2023), and "undue or unreasonable preference" of Bucksport Generation over other Bangor Gas customers, in violation of 35-A M.R.S. § 702(1) (2023).  The Public Advocate also argues that the Commission's order should be vacated because the Commission relied on information not included in the evidentiary record.  We disagree with the Public

Advocate's first argument, find the second argument waived, and affirm the Commission's order.

## I. BACKGROUND

[¶2]  The following background is drawn from the administrative record and the Commission's order dated January 27, 2023.  *See Bangor Nat. Gas Co.*, Request for Approval of Special Rate Agreement, No. 2022-333, Order (Me. P.U.C. Jan. 27, 2023).

[¶3]  On November 9, 2022, pursuant to 35-A M.R.S. § 703(3-A) (2023), Bangor Gas petitioned the Commission for approval of an amendment to its existing special rate contract with Bucksport Generation.  The proposed amendment extended the terms of the existing contract, which was set to expire on January 31, 2023.  On November 16, 2022, the hearing examiners[1] issued a notice of proceeding and opportunity to intervene.  The Public Advocate, Bucksport Generation, and ND OTM LLC (ND Paper) all filed timely petitions to intervene, and at a preliminary case conference on November 29, the hearing examiners permitted the Public Advocate and Bucksport Generation to participate as parties to the proceeding.  *See* 65-407 C.M.R. ch. 110, § 8(B)(1), (3) (effective Nov. 26, 2012).  The hearing examiners then issued a written

_____

[1]  A "hearing examiner" is a presiding officer in an adjudicatory proceeding at the Commission. 65-407 C.M.R. ch. 110, § 2(N) (effective Nov. 26, 2012).

order granting ND Paper discretionary intervenor status, but limiting its role to commenting on, briefing, and filing exceptions or objections relating to issues of law and policy relevant to special rate contracts in general. *See id.* § 8(B)(2).

[¶4]  On December 6, the hearing examiners issued a procedural order establishing a schedule that allowed for discovery, intervenor comments or testimony in response to Bangor Gas's petition, a response by Bangor Gas, and briefing from the parties.  On December 9, the Public Advocate filed comments on the proposed amendment, and Bucksport Generation filed direct testimony that same day.  Soon after, Commission staff, the Public Advocate, and Bangor Gas each served data requests[2] on Bucksport Generation.  On December 22, the hearing examiners held a technical conference, at which the parties and Commission staff posed questions to Bucksport Generation and followed up on data requests.  On December 28, Bangor Gas filed rebuttal testimony in response to the Public Advocate's comments and Bucksport Generation's direct testimony.

[¶5]  The parties submitted briefing and, on January 13, 2023, the hearing examiners issued a report recommending that the Commission approve the amended special rate contract.  On January 17, Bucksport Generation filed

---

[2]  "In addition to the discovery rights provided by the Maine Rules of Civil Procedure, all parties shall have the right to serve data requests upon any other party."  65-407 C.M.R. ch. 110, § 9(B)(2).

4

comments in support of the hearing examiners' report, and the next day Bangor Gas and the Public Advocate filed exceptions. On January 27, the Commission issued a written order adopting the hearing examiners' report.

[¶6] In its order, the Commission found that the "annual revenue from [the special rate contract] would exceed the annual marginal costs of service at recent usage levels." It also found that, under the special rate contract, Bucksport Generation would make "a positive revenue contribution when compared to the costs of operating" the pipeline serving Bucksport Generation. Based on these findings, the Commission concluded that the proposed special rate contract was "beneficial to Bangor Gas's other ratepayers" and ordered that it be approved. The Public Advocate timely appealed the Commission's order. M.R. App. P. 2B(c)(1), 22.

## II. DISCUSSION

### A. Standard of Review

[¶7] Generally, we review the Commission's decisions with great deference, looking "only to determine whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 18, 90 A.3d 451 (alteration and quotation marks omitted). More specifically, we "will disturb a decision only when the

Commission abuses the discretion entrusted to it, or fails to follow the mandate of the [L]egislature, or to be bound by the prohibitions of the [C]onstitution." *Off. of the Pub. Advoc. v. Pub. Utils. Comm'n*, 2015 ME 113, ¶ 15, 122 A.3d 959 (quotation marks omitted). It is the appellant's burden to establish that the Commission's action violates one or more of these standards. *Cent. Me. Power Co.*, 2014 ME 56, ¶ 19, 90 A.3d 451.

[¶8] We particularly defer to the Commission's "expert judgment in choosing among various ratemaking techniques or methodologies." *New England Telephone & Telegraph Co. v. Pub. Utils. Comm'n*, 448 A.2d 272, 279 (Me. 1982); *see New England Telephone & Telegraph Co. v. Pub. Utils. Comm'n,* 470 A.2d 772, 776 (Me. 1984) ("The Commission has broad discretion in selecting among various rate-making methodologies, provided that they are reasonably accurate. The Commission is not required to manipulate its methodologies to eliminate every shred of suggested inaccuracy." (citation omitted)); *Indus. Energy Consumer Grp. v. Pub. Utils. Comm'n*, 2001 ME 94, ¶ 11, 773 A.2d 1038; *see also Pub. Advoc. v. Pub. Utils. Comm'n*, 1998 ME 218, ¶ 5, 718 A.2d 201; *Quirion v. Pub. Utils. Comm'n*, 684 A.2d 1294, 1297 (Me. 1996); *Am. Ass'n of Retired Persons v. Pub. Utils. Comm'n*, 678 A.2d 1025, 1029 (Me. 1996); *City of Portland v. Pub. Utils. Comm'n*, 656 A.2d 1217, 1221 (Me. 1995);

*Pub. Advoc. v. Pub. Utils. Comm'n*, 655 A.2d 1251, 1253 (Me. 1995); *Millinocket Water Co. v. Me. Pub. Utils. Comm'n*, 515 A.2d 749, 752 (Me. 1986); *Mech. Falls Water Co. v. Pub. Utils. Comm'n*, 381 A.2d 1080, 1097-98 (Me. 1977); *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 153 Me. 228, 230-31, 136 A.2d 726, 729 (1957).

[¶9]  We also apply a deferential approach when reviewing an agency's interpretation of a statute it administers, in recognition of the agency's "greater expertise in matters of [relevant] concern and greater experience administering and interpreting those particular statutes." *S.D. Warren Co. v. Bd. of Env't Prot.*, 2005 ME 27, ¶ 5, 868 A.2d 210.  Therefore, "[w]hen reviewing [the Commission's] interpretation of a statute that is both administered by the [Commission] and within [its] expertise," we first determine de novo whether the statute is ambiguous, i.e., "reasonably susceptible of different interpretations." *Cent. Me. Power Co.*, 2014 ME 56, ¶ 18, 90 A.3d 451 (quotation marks omitted).  We then "either review the Commission's construction of the ambiguous statute for reasonableness or plainly construe the unambiguous statute."  *Id.* (quotation marks omitted).  "Although the Commission's interpretation of a statute that it administers is not conclusive or binding on us, such an interpretation . . . should be upheld unless the statute plainly compels a contrary result."  *Off. of the Pub. Advoc.*, 2015 ME 113, ¶ 15, 122 A.3d 959

(quotation marks omitted). The same standard also applies to the Commission's interpretation of its own technical regulations, provided those regulations comport with the relevant statutes. *Cent. Me. Power Co.*, 2014 ME 56, ¶ 19, 90 A.3d 451.

[¶10] With these principles in mind, we turn to the merits.

## B. Whether the Commission reviewed the amendment to the special rate contract under the proper standard.

[¶11] The Public Advocate argues that the Commission erred by reviewing the proposed amendment to the special rate contract under the wrong standard. Appellees counter that the standard applied by the Commission comports with precedent, the relevant statutes, and the Commission's prior decisions. We agree with the appellees.

[¶12] The rates charged for utility service in Maine are established in accordance with Title 35-A. Under section 309 of that title, utility rates generally must be charged uniformly, according to schedules, or "tariffs," published by the utility:

> Except as otherwise provided in section 703, it is unlawful for any public utility to charge, demand, collect or receive, for any service performed by it within the State or for any service in connection with that performance, a greater or lesser compensation than is specified in such printed schedules as may at the time be in force, or to demand, collect or receive any rate, toll or charge not specified in the schedules. The rates, tolls and charges named in the schedule

> are the lawful rates, tolls and charges until they are changed as provided in this Title.

35-A M.R.S. § 309(1) (2023); *see* Harwood, *Maine Regulation of Public Utilities* 104 (2d ed., 2018); *see also* 35-A M.R.S. § 703(1) (echoing section 309's tariff rate requirement). However, section 703 provides an exception to the tariff rate requirement for special rate contracts:

> A public utility, subject to the commission's approval, may make a contract for a definite term for its product or service, but the published rates for the product or service may not be changed during the term of the contract without the commission's consent.

35-A M.R.S. § 703(3-A); *Taylor v. Pub. Utils. Comm'n*, 2016 ME 71, ¶ 11, 138 A.3d 1214. We have previously recognized that Title 35-A and the Commission's regulations "provide no guidance regarding by what standard a special [rate] contract is reviewed or approved and are therefore ambiguous on that basis." *Taylor*, 2016 ME 71, ¶ 11, 138 A.3d 1214 (alterations and quotation marks omitted).

[¶13] In the absence of a strict legislative or regulatory mandate, the Commission has reviewed special rate contracts under several different standards, depending on the type of utility service at issue. When reviewing a special rate contract for electric transmission and distribution (T&D) service, the Commission typically asks three questions:

1.  Is the rate discount in fact necessary?

2.  If so, is the rate above the marginal cost of service to the customer?

3.  Is the contribution above marginal costs substantial and is the contribution maximized?

*Cent. Me. Power Co.,* Request for Approval of Special Rate Contract with Newpage Corporation (Formerly Mead Oxford Corp.), No. 2005-451, Order Part II at 3 (Me. P.U.C. Feb. 17, 2006). The requirement that the customer's contribution above marginal costs be "maximized" essentially means that the discount below the normal tariff rate must be as small as possible. *Id.* at 3-4.

[¶14] However, when the Commission reviews a special rate contract for natural gas service—like the contract at issue in this case—it asks whether a proposed special rate contract will provide certain discrete benefits to the utility and its customers, such as encouraging large-volume customers to use gas provided by the utility instead of other fuels, and whether the "revenue produced by the contract rates would exceed the marginal cost of providing service." *Bangor Nat. Gas Co.*, Request for Approval of Special Rate Agreement, No. 2022-333, Order at 10 (Me. P.U.C. Jan. 27, 2023); *see, e.g., N. Utils., Inc.*, Request for Approval of a Firm Gas Transportation Agreement, No. 2000-848, Order at 2 (Me. P.U.C. Dec. 7, 2000). Thus, in contrast to special rate contracts for T&D service, the Commission does not require that special rate contracts

for natural gas service maximize revenues above the marginal cost of service. The Public Advocate takes issue with this approach, arguing that the Commission must consider whether a special rate contract for natural gas service maximizes revenues above the marginal cost of service.

[¶15]   However, neither Title 35-A nor the Commission's regulations mandate a particular standard of review for special rate contracts.  *See Taylor*, 2016 ME 71, ¶ 11, 138 A.3d 1214.  Furthermore, the Commission's decision to apply a different standard of review depending upon whether it is reviewing a special rate contract for natural gas service or for T&D service is a rational one, because natural gas utilities are subject to market forces that do not apply to T&D utilities.  *See Pub. Utils. Comm'n*, Investigation of Request to Order Natural Gas Companies to Make Available Commercial Customer Lists, No. 2006-83, Order at 6 (Me. P.U.C. June 29, 2006) ("The nature of competition in the gas and electric industries is distinctly different.  Unlike for electricity, other fuels can be substituted for natural gas for virtually all natural gas end uses."); Harwood, *supra* at 189.  As the Commission noted in its order, the standard it used to review this special rate contract

> recognizes the reality of the competitive nature of the natural gas market in Maine, where large customers like Bucksport [Generation] often have viable options in choosing fuels and suppliers, and natural gas utilities compete for customers with one

another. The market realities of [the] natural gas industry do not allow utilities the leverage that electric utilities have over their large customers for a utility to "maximize" its revenue in negotiating [a special rate contract].

*Bangor Nat. Gas Co.*, Request for Approval of Special Rate Agreement, No. 2022-333, Order at 12 (Me. P.U.C. Jan. 27, 2023). These are relevant considerations that fall within the Commission's expertise and discretion.

[¶16] We therefore hold that, barring an express prohibition under Title 35-A or the Commission's regulations, it was not "unreasonable, unjust or unlawful" for the Commission to apply different standards of review to special rate contracts arising under different market conditions. *Cent. Me. Power Co.*, 2014 ME 56, ¶ 18, 90 A.3d 451.

## C. Whether the Commission's approval of the amended special rate contract resulted in an unjust, unreasonable, or discriminatory rate.

[¶17] The Public Advocate also urges us to vacate the Commission's order because, the Public Advocate claims, it resulted in unjust and unreasonable rates that are prohibited by section 301, and discriminatory rates that are prohibited by section 702.

[¶18] Section 301 requires that rates charged for utility service in Maine be "just and reasonable." 35-A M.R.S. § 301(2). We have previously explained that this requirement encompasses "a range" rather than "a particular single rate" and held that "[i]t is within the sound discretion of the Commission" to fix

12

rates within that range. *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 382 A.2d 302, 327-28 (Me. 1978). Generally, we will not hold that a rate approved by the Commission violates section 301 unless it is "so low as to constitute an unconstitutional confiscation of private property" or "so high as to constitute an unreasonable burden on ratepayers." *New England Telephone & Telegraph Co. v. Pub. Utils. Comm'n*, 390 A.2d 8, 30 (Me. 1978).

[¶19] Section 702 provides in relevant part that it is "unlawful for a public utility to give any undue or unreasonable preference, advantage, prejudice or disadvantage to a particular person." 35-A M.R.S. § 702(1). This means that, in general, the starting point for setting rates should ensure that each member of a class of ratepayers pays the same rate, tied to the cost of serving that class. *See Holmquist v. New England Telephone & Telegraph Co.*, 637 A.2d 852, 853 (Me. 1994); *Me. Water Co. v. Pub. Utils. Comm'n*, 482 A.2d 443, 458 (Me. 1984).

[¶20] As noted above, however, section 703 expressly allows individual customers to enter into special rate contracts. This allowance is based on the economic theory that a ratepayer contributing something greater than the marginal cost of serving that customer benefits the other ratepayers if the alternative to the special rate would be that the individual customer would exit

the system, contributing nothing to the payment of the utility's fixed costs. *See* Harwood, *supra* at 134. "Mere differences" in the rates charged for utility service "are not unjust discrimination." *Holmquist,* 637 A.2d at 853. Rather, "[o]nly differences which cannot be justified on a legitimate basis" violate section 702. *Id.*

[¶21] As also noted above, the Commission is given broad discretion in establishing the appropriate test and applying it to determine whether a particular special rate contract will sufficiently benefit other ratepayers. Applying the Commission's test, we see nothing in the record suggesting that the Commission's approval of the amendment to the special rate contract here will result in unjust or unreasonable rates for other Bangor Gas customers. To the contrary, the Commission found that the special rate contract not only allows Bangor Gas to cover any marginal costs associated with serving Bucksport Generation, but also allows Bangor Gas to defray some of its fixed costs. The Public Advocate concedes this point but argues that Bucksport Generation should be on the hook for a larger portion of the fixed costs. However, as the Commission noted in its order, Bucksport Generation's status as a Bangor Gas customer is not a given. If the cost of taking service from Bangor Gas is too high, Bucksport Generation can use other fuels. If it did so,

14

Bucksport Generation would not defray any of Bangor Gas's fixed costs. Instead, those costs would fall to other Bangor Gas ratepayers.

[¶22]  Given these specific circumstances, we cannot conclude that the amended special rate contract resulted in a discount for Bucksport Generation that was "so high as to constitute an unreasonable burden on" other ratepayers served by Bangor Gas.  *New England Telephone & Telegraph Co.*, 390 A.2d at 30. The value of incentivizing continued financial contributions from Bucksport Generation to Bangor Gas's fixed costs also justifies disparate rate treatment, where the alternative would be no contribution.

[¶23]  To the extent that the Public Advocate is arguing that a general cost-of-service study is needed to determine whether the terms of this special rate contract are reasonable or nondiscriminatory, the Commission disagreed, which was a reasonable conclusion.

[¶24]  Requiring a general cost-of-service study makes sense when setting general rates.  "Establishing cost of service for rate design is a complex process," *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 405 A.2d 153, 186 (Me. 1979), and a comprehensive study may be needed to set general rates.  If the Public Advocate believes that such a general review is necessary, it can

petition the Commission to initiate proceedings to review Bangor Gas's general rates pursuant to 35-A M.R.S. § 1702(3) (2023).

[¶25] As the Commission indicated in its order, it may sometimes be necessary to perform a cost-of-service study to determine the cost of serving a customer seeking a special rate contract and ensure that other ratepayers would not be subsidizing service to that customer. But the Commission reasoned that such a costly and time-consuming study was not required in this case, given that Bucksport Generation is connected directly to the transmission network and uses no distribution services. As the Commission also noted, the Public Advocate did not articulate what additional information it believed was needed to determine the size of any discount being given to Bucksport Generation. Nor has the Public Advocate articulated before us on appeal what additional information may be necessary.

[¶26] In summary, because the Commission did not apply an improper standard of review, and its approval of the special rate contract did not result in unjust, unreasonable, or discriminatory rates, we decline to disturb its decision.

**D.     Whether the Commission created an evidentiary record.**

[¶27]  The Public Advocate next argues that the Commission failed to create an evidentiary record in this proceeding and that the Commission's order is therefore unsupported by the record.  While appellees argue that the evidentiary record includes everything in the administrative record, the Public Advocate argues that this cannot be the case because the Commission did not make any rulings on the admissibility of evidence in the record.

[¶28]  Appellees also contend that because the Public Advocate failed to raise the issue to the Commission, its argument is waived on appeal.  On this point, we agree.  The Public Advocate could have raised this issue to the Commission at the preliminary case conference, in its comments submitted in response to Bangor Gas's petition, in the technical conference, in its briefing prior to the Examiners' report, or in its exceptions to the Examiners' report.  *See* 65-407 C.M.R. ch. 110, § 11(D).  Because it failed to do so, the Public Advocate's argument is waived on appeal.  *See Forest Ecology Network v. Land Use Regul. Comm'n*, 2012 ME 36, ¶ 24, 39 A.3d 74 ("Issues not raised at the administrative level are deemed unpreserved for appellate review.").

[¶29]  We acknowledge, however, that the Public Advocate may have a point when it suggests that not every item generated in the course of a

Commission proceeding is a part of the evidentiary record. The Commission's regulations are not clear on this point.

[¶30] Bangor Gas initiated this proceeding by seeking approval of its special rate contract with Bucksport. This was followed by the Public Advocate's intervention and discovery was taken through responses to data requests and at a technical conference. The Commission did not then hold an evidentiary hearing before issuing its approval. It appears fairly clear that this approval process constituted an "[a]djudicatory [p]roceeding" as that term is defined by 65-407 C.M.R. ch. 110, § 2(A), which means that Bangor Gas was entitled to a hearing if it had wanted one. It also seems fairly clear that when an evidentiary hearing is held, discovery materials are not considered to be a part of the evidentiary record upon which the Commission will make its decision in the absence of a specific procedural order or submission of the discovery material to the hearing examiner, who may admit it into the record. *See* 65-497 C.M.R. ch. 110, §§ 8(F)(1)(b), 9, 10. Confusing this issue is 65-497 C.M.R. ch. 110, § 8(F)(1)(b), which provides that the presiding officer may "rule on the admissibility of evidence, and admit into the record material relied upon by the Commission pursuant to section 8(I)4, provided that the presiding

officer is either authorized to practice before the Maine Supreme Judicial Court or a Commissioner." There is no section 8(I)4.

[¶31] It is unclear what materials are considered to be a part of the evidentiary record upon which the Commission may make its determination when an evidentiary hearing is not held. Taking the position that everything submitted by the parties is included in the record upon which it can make its determination (in the absence of an evidentiary hearing that apparently culls that record), the Commission points to 65-407 C.M.R. ch. 110, § 8(H), identifying the contents of the "record," and providing that "[i]n an adjudicatory proceeding, the Administrative Director shall maintain and preserve a record which shall consistent of . . . (b) evidence received or considered." The Commission argues that whatever the administrative director includes in the administrative record constitutes the evidence on which the Commission may rely. But this argument conflates the administrative record—a record of anything filed with the Commission—with evidence admitted upon which the Commission may make its determination. Under the framework outlined in the rules, it is the hearing examiner who decides what material is included as a part of that evidentiary record, not the administrative director. Section 8(F)(b) also indicates that a hearing examiner must be a lawyer or commissioner with the

ability to review the admissibility of evidence, consistent with 65-407 C.M.R. ch. 110, § 10(B), which provides that the Maine Rules of Evidence "shall be followed in Commission adjudicatory proceedings," with limited enumerated exceptions.

[¶32]  Parties before the Commission are entitled to adequate notice of what materials are evidence upon which the Commission will make its decision. We presume that the Commission will clarify its regulations.  For purposes of this appeal, however, we need not address whether this lack of clarity violated any procedural due process right of the Public Advocate, because, as noted, the Public Advocate has waived this argument.

The entry is:
Judgment affirmed.

---

William S. Harwood, Esq. (orally), Richard P. Hevey, Esq., and Kristina R. Winther, Esq., Office of the Public Advocate, Augusta, for appellant Office of the Public Advocate

Robert A. Creamer, Esq. (orally), Carol MacLennan, Esq., and Jordan McColman, Esq., Maine Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

Benjamin James Smith, Esq., Smith Legal LLC, Augusta, for appellee Bangor Natural Gas Company

Joseph G. Donahue, Esq., and Steven A. Hudson, Esq., Preti Flaherty Beliveau & Pachios, LLP, Augusta, for appellee ND OTM LLC

David P. Littell, Esq., and Eben M. Albert, Esq., Bernstein Shur, Portland, for appellee Bucksport Generation, LLC

Public Utilities Commission docket number 2022-00333
<small>FOR CLERK REFERENCE ONLY</small>